Otto Kerner, Attorney General (George F. Barrett, Attorney General), Appellant, v. Carl D. Kinsey and First National Bank of Chicago et al., Appellees.

Gen. No. 42,117.

Heard in the first division of this court for the first district at the February term, 1942. Opinion filed November 30, 1942.

George F. Barrett, *pro se;* Albert E. Hallett, Assistant Attorney General, of counsel.

Thomas Hart Fisher, of Chicago, for certain other appellant; Norman Crawford, of Chicago, of counsel.

Amberg, Livingston, Kearns & Dahlin, of Chicago, for certain appellee; Frank L. Paul and Ralph J. Mohan, both of Chicago, of counsel.

Ernest Schein, of Chicago, for certain other appellee.

Mr. Justice O'Connor delivered the opinion of the court.

By this appeal George F. Barrett, the present Attorney General of the State of Illinois, and Rudolph Ganz, as Successor Trustee, seek to reverse a decree entered by the circuit court of Cook county June 30, 1941, dismissing the complaint, as amended, as to The

First National Bank of Chicago and other defendants for want of equity.

The record discloses that October 3, 1933, Otto Kerner, the then Attorney General of the State, filed his complaint in equity, against the college and Kinsey, in which it was alleged that Charles H. Ditson, deceased, late of New York City, in his lifetime was possessed of large wealth and desired to give to the public an opportunity to obtain education and instruction in music; that on December 3, 1927, he executed his will by which he bequeathed to 8 institutions, $100,000 each, one of which was the Chicago Musical College, a corporation. Paragraph 9 of the will is as follows: "(9) I direct and appoint that the sum of One Hundred Thousand Dollars ($100,000) shall be paid to the Chicago Musical College, to be used in establishing a fund, the income of which shall be used for any one or more of the purposes herein mentioned as shall be in the judgment of the officers of said College of the greatest benefit musically to said College, to-wit: in establishing and maintaining a chair or chairs of music or musical history or musical aesthetics, or in establishing and maintaining scholarships or fellowships in music, or in giving public performances of the musical compositions of talented students and graduates of said College, and if preferred of other musical composers.

"Such fund to be known as the Oliver Ditson Endowment, and any chair or scholarship or fellowship which is established to bear his name; but nothing herein shall prevent said Chicago Musical College from investing the money as part of its general fund and applying a proportionate part of the income of its general fund to the purposes of this bequest."

It is further alleged that Charles H. Ditson died May 14, 1929, and that his will was admitted to probate by the surrogate court of New York and that the executors of his estate "duly paid during the year

1931 the sum of One Hundred Thousand Dollars ($100,000) in cash to Chicago Musical College, an Illinois corporation, pursuant to . . . subparagraph (9) of said will; that said Chicago Musical College, . . . is a corporation for profit organized and existing'' under the laws of Illinois and having its principal place of business at 64 East Van Buren street, Chicago; that at the time of payment of the $100,000 to the Musical College and at all times since, defendant Carl D. Kinsey has been the president of the college ''and legal or equitable owner of all of the capital stock of said corporation''; that all of the stock certificates are in Kinsey's name except directors' qualifying shares and those have been endorsed in blank and delivered to Kinsey. That the $100,000 ''constitutes a public charity or trust fund,'' and is subject to the laws of Illinois and that the Chicago Musical College and its officers and directors were, by the terms of Ditson's will, charged with the duty of administering the fund pursuant to the statutes of this State for the purposes mentioned in Ditson's will. That upon receipt of the trust fund Kinsey, as president of the college, caused announcements of the creation of such fund to be made in publications of the college to the public generally; that afterward, during 1931 and 1932, the college held examinations amongst its students who were receiving musical education for the purpose of selecting those entitled to receive scholarships and fellowships in music; that the income from the trust fund had been insufficient to pay for the scholarships and fellowships; that the college had purported to award scholarships for the school year of 1933–1934 but that they cannot be paid for from the income of the trust fund for the reason that Kinsey had personally handled and administered the fund; that in the early part of 1931, the college, through Kinsey as president, undertook to make improvements on real estate owned by the college, consisting of the land and building at 64

East Van Buren street, by remodeling the theater in the building; that most of the remodeling was done prior to the receipt by the college of the $100,000 and that about $70,000 of the fund was so unlawfully applied by the college, contrary to the terms of Ditson's will and the statutes of Illinois; that upon the remodeling of the theater it was leased to a company which commenced the operation of the theater but that such operation was "disastrous financially" and the lessee thereafter became wholly insolvent, surrendered possession of the theater to the college and defaulted in its obligation to pay rent to the college. That April 14, 1932, which was more than 6 months after the improvement of the theater was completed, Kinsey, as president of the college, presented a resolution of a special meeting of the Board of Directors, which was approved by a majority of them, which resolution purported to confirm the action of Kinsey in investing the $100,000 in remodeling the theater. The resolution continued: "which investment, in accordance with the bequest, provides a permanent fund thru the income from the theatre for scholarships to worthy and talented students in years to come. At the present time the theatre is rented for $1600 monthly and this rental provides a good profit for scholarships on the investment of $100,000, in the theatre and building." And it was further alleged on information and belief that at the time the resolution was passed, the lessee of the theater had wholly failed and was insolvent. That approximately $70,000 of the fund invested in the remodeling was yielding no substantial income.

It was further alleged that in June or July, 1933, the college purported to convey the title to the real estate at 64 East Van Buren, to defendant the Northwestern Mutual Life Insurance Company, the holder of a first mortgage on the real estate, in consideration of the cancellation by the insurance company of the existing mortgage executed by the college, and the re-

lease of Kinsey, who had personally endorsed the note. That if the entire trust fund of $100,000 had been invested, as it was purported to be by the resolution of the Board of Directors of the college, above referred to, the purported conveyance of the real estate to the insurance company constituted a complete destruction of the Ditson endowment fund unless the property so conveyed be returned to the college by the insurance company. It was further alleged upon information and belief that the college purported to have made other unauthorized and unlawful investments of the trust fund; that the funds were used to pay off losses and obligations of the college and for current operating expenses and no proper books were kept; that the college during 1931 and afterward, "and now is" the owner of first mortgages and bonds secured by trust deeds on Illinois real estate of the face value of $120,000; that about September 22, 1933, Kinsey, as president of the college, presented a resolution to the Board of Directors which was signed by them, setting up that the trust fund of $100,000 was then invested in first mortgage bonds secured on Illinois real estate; that substantially all of the mortgages and bonds were in default and in the hands of an attorney for the college for adjustment and foreclosure; that the legal title to certain of the real estate securing the bonds and mortgages, had been conveyed to Kinsey individually and that the total market value of the bonds and mortgages was less than $30,000; that the investment was unlawful and unauthorized; that the college had no general endowment or trust fund since the receipt by it of the $100,000; that it was the duty of the officers and directors of the college to keep the trust fund separate and apart from the other properties belonging to the college, to be known as "Oliver Ditson Endowment"; that the fund had not been properly administered by the college or Kinsey and that various persons, firms and corporations had received the funds

knowing that they constituted a part of the trust fund and knowing that "such payments were unauthorized and unlawful." That the funds were mingled with other funds of the college and disbursed to creditors of the college and were lost or in danger of being lost and destroyed. That a budget had been prepared for the school in 1933–1934 but that there were no assets or properties in the trust fund to pay for the scholarships and as a result the public would be deprived of the benefits of the fund.

It was further alleged that all of the funds improperly and unlawfully invested by the college or Kinsey, as president, should be repaid to the trust fund and the prayer was that the college and Kinsey, who were made defendants, be required to answer and to account; that the college and Kinsey, as president, be removed as trustee of the fund and a successor appointed by the court; and that all persons who had received any portion of the fund with knowledge that it constituted a trust fund, be compelled to refund, and that pending the hearing, the college and Kinsey be restrained and enjoined from investing, paying or transferring any part of the funds or any part of the assets or property into which the funds may have been invested.

October 18, 1933, 15 days after the complaint was filed, on motion of complainant, an order was entered giving leave to file an amendment to the complaint instanter and that the demurrer theretofore filed to the original bill stand to the complaint as. amended. On the same day the amendment was filed, in which it was alleged on information and belief that the college and Kinsey, as president, had conveyed and delivered to the Northwestern Mutual Life Insurance Company, the First National Bank of Chicago and others, certain properties, cash and securities belonging to and constituting a part of the trust fund without other than nominal consideration, and that these corporations and

the other persons named should be required to make discovery of such property; that the college and Kinsey were insolvent, unwilling and unable to re-establish the fund and that unless the property received by the insurance company, the bank and others, was returned, the fund would be irreparably impaired; that pending the hearing of the cause, the insurance company, the bank and the other parties be restrained and enjoined from expending, paying or transferring any of the properties, cash or securities now held by them and the insurance company. The bank and the other parties were made additional parties defendant.

The bank filed its answer setting up that Kinsey had a checking account in the bank showing a balance of $1,536.72, and that the college had a checking account standing in its name, the balance of which "has changed from time to time in accordance with an order entered by this Honorable Court on the 27th of October, A. D. 1933." That the accounts evidence the customary debtor and creditor relationship between the bank and its debtors; that it had no knowledge that any part of the funds were trust funds or constituted any part of the Oliver Ditson Endowment Fund.

December 21, 1933, a consent decree was entered. On the last page of the decree, below the signature of the chancellor appears: "This decree is hereby consented to." Then follow the signatures of the Attorney General and his assistants and four firms of attorneys representing four defendants. Over the signature of counsel for the bank appears the following: "Decree consented to only as it pertains to the First National Bank of Chgo."

From the decree it appears that the Chicago Musical College had changed its name to "C. D. K., Inc." The facts of the Ditson will and the bequest of $100,000 to the Musical College then follow, and the payment of the legacy to the college by the executors of Ditson's estate. That the college had receipted to the trustees

for the $100,000 which the court found constituted "a public charity or trust fund, the administration of which was and is subject to the laws of the State of Illinois"; and that it was the duty of the college and its officers and directors to administer the fund pursuant to the statute's for the uses set forth in the will. Then follow findings substantially in accordance with the allegations of the complaint and a further finding that after the name of the Chicago Musical College had been changed to C. D. K., Inc., a new corporate entity was organized November 22, 1933, and incorporated under the laws of the State under the name of Chicago Musical College, whose object and purposes were the same as the old college and that it was now under new management; that the assets, which included real estate bonds and mortgages, which were transferred by the old college to the new college, had greatly depreciated in value. That the bonds and mortgages had a face value of $172,600 and that the new college was assignee of the entire assets of the old college and desired to reestablish the Ditson Endowment Fund, and that simultaneously with the entry of the decree, had conveyed and transferred the bonds and mortgages to Rudolph Ganz, who was appointed successor trustee to liquidate the securities and administer the fund in accordance with the terms of the Ditson will, providing that any amount in excess of $100,000 realized by Ganz, the successor trustee, be paid by him to the new college. A schedule of the bonds and mortgages was attached showing a par value of $172,600.

It was further adjudged that the decree was entered "without prejudice to any of the parties hereto, . . . and particularly that this decree shall not, in any manner whatever, lessen or alter the liability or obligation, legal or equitable, or impair any defense, present or prospective, of any defendant in this cause as the same may be hereafter otherwise determined,"

provided that the disposition of the real estate mortgages and bonds of the par value of $172,600 should be final; it being the intention of the parties that Ganz, as successor trustee, should receive assets or property of the value of $100,000, but in no event more than that sum.

It was further decreed that the successor trustee should at least quarterly, pay to the new college the net income derived from the bonds and mortgages and that the college should use the moneys so received in accordance with the Ditson will. It was further decreed that the restraining order theretofore entered be dissolved; "that First National Bank of Chicago, . . . is hereby authorized . . . to pay . . . to Kinsey each and all of the funds now on deposit to his individual credit" and the bank was "authorized and empowered to pay" to the new college, all funds on deposit with the bank. The court reserved jurisdiction to carry out the terms of the decree.

On the same day, December 21, 1933, a supplemental decree was entered by consent of all parties, in which it was decreed that nothing contained in the decree should be deemed determinative of any issue raised by the complaint as amended, and the answer of the insurance company, except as to the real estate bonds and mortgages of $172,600 face value.

About a year after the entry of the decree, Ganz, the successor trustee, filed his answer to the bill of complaint, as amended, as did the new college, and October 18, 1940, Kinsey filed his answer. About 6 months thereafter, April 18, 1941, an order was entered on motion of the Attorney General striking portions of Kinsey's answer by which he sought to readjudicate whether the Ditson bequest was a public, charitable trust. On the same day an order was entered referring all issues "raised by the amended complaint and the answers thereto (but not the issues raised by the counterclaim and the answers thereto)"

to a master in chancery to take the evidence and make up his report with his conclusions of law and of fact.

June 25, 1941, the master made his report which was filed 2 days later, in which he recites that on June 9th, certain of the parties were present or represented by counsel. (The bank does not appear to have been represented.) That he took the evidence which consisted of the testimony of one witness, Russell A. Elmquist, and certain documents. The master found that the old college was incorporated under the laws of Illinois in 1877, with a capital stock of $6,000, which was increased from time to time and in April, 1915, it was increased to $100,000; that it operated continuously until 1933, its principal place of business being 64 East Van Buren street, Chicago. Then follow a number of findings similar to the allegations of the complaint as above mentioned. That May 12, 1931, H. Hobart Porter and Boston Safe Deposit Company, as executors of the estate of Charles H. Ditson, drew a check for $100,000 on The Atlantic National Bank of Boston, payable to the order of ''Chicago Musical College'' and forwarded it, together with a ''legacy receipt, release and waiver of citation'' to the college, in which the old college acknowledged receipt of the $100,000 from the executors of the Ditson estate. The receipt was signed ''Chicago Musical College, By Carl Kinsey, President.'' Kinsey endorsed the check as follows: ''Pay to Carl Kinsey or order Chicago Musical College Carl Kinsey President Carl Kinsey'' and deposited it May 23, 1931, in the First National Bank, which at that time opened a personal checking account in the name of Carl D. Kinsey.

The evidence further shows that June 22, 1931, Kinsey opened an account in the bank in the name of the old college. July 2, following, Kinsey mingled his own funds with the $100,000 by making deposits in the personal account and withdrawing moneys for his personal expenses. On that date the account totalled

$103,145.58. Thereafter the balance declined until the account was closed October 6, 1933. January 9, 1932, the old college borrowed $35,000 from The First National Bank and gave its note for that amount, payable to the bank 90 days after date, with interest at 5 per cent per annum. January 25, Kinsey withdrew $80,000 from his initial account in the bank, leaving a balance of $1,345.94. On the same day he deposited $80,000 in the account of the old college in the bank. April 8, the old college gave its renewal note to the bank for $35,000, due 90 days after date. April 13, Kinsey withdrew $80,000 from the Chicago Musical College account and was given a certificate of deposit which was payable to him, personally. July 7, the old college again renewed its note for $35,000, due 62 days after date. July 29, Kinsey reported that the certificate of deposit was lost or destroyed and wanted a duplicate issued. The bank demanded a bond for $80,000, but later this demand was withdrawn and a duplicate certificate of deposit was issued and referred to the bank's law department. Kinsey, personally, endorsed the certificate in blank. The bank applied $35,000 of the $80,000 represented by the certificate of deposit issued in payment of the note of the college held by it, and Kinsey withdrew the remaining $45,000. Kinsey afterward used the $45,000 for his personal expenses. October 6, 1933, the personal account and the old college account were closed by Kinsey.

The master found the facts as above stated, and further found that Kinsey, in accordance with the decree of December 21, 1933, had turned over the bonds and mortgages to Ganz, and that the mortgages, bonds and other properties so turned over, had been fully liquidated, and the fair, cash market value of them was $65,000. The master's conclusions were that Kinsey had applied $65,000 of the trust fund to his own use and had made restitution to Ganz, as successor trustee, and that having made such restitution, Kinsey

was entitled to have satisfied fully all of his liability and obligation to the trust fund.

The master further found in his conclusions that $35,000 of the trust fund was applied by the bank in payment of the note of the old college for that sum; that "the Master does not by this finding intend to pass on the question of the right and the legality of The First National Bank of Chicago to make this application," and recommended that that question be reserved for future determination by the court. He further recommended that the suit be dismissed for want of equity as to the other defendants.

Objections to the report were filed by the bank but the master did not pass upon them, certifying that "Because of certain emergencies suggested to the Master, the Master has not passed on the foregoing objections." Other objections were filed by Kinsey, by Ganz, as successor trustee, and by the Attorney General, but none of them were passed upon by the master because of "certain emergencies suggested."

Two days after the report was made it was filed, June 27, 1941, and on that day the chancellor entered an order giving leave to file the report, the objections to stand as exceptions. Three days afterward, viz., June 30, 1941, the chancellor entered a decree in which it was recited that the matter came on to be heard upon the pleadings, and the court, having examined the master's report, found that the findings and conclusions of the master were true and correct; that the proceedings had been prosecuted by the Attorney General in good faith; that he was entitled to a decree finding that Kinsey had applied to his own use $65,000 of the trust fund and that he had made restitution to Ganz, as successor trustee, in accordance with the decree of December 21, 1933. And having made restitution to Ganz of assets and properties equivalent in value "to all moneys received and expended by him [Kinsey] for his own use and benefit is entitled to the

decree of this Court satisfying fully all liability and obligation on his part'' to the trust fund. The court further found that the complaint, as amended, should be dismissed as to defendant, the First National Bank of Chicago, and as to the other defendants, for want of equity.

It is from this decree that the Attorney General appeals, contending that the decree should be reversed and the cause remanded with instructions ''to enter judgment for $35,000, plus interest thereon at the rate of 5% per annum from July 29, 1932, against Carl D. Kinsey and The First National Banking Corporation, a national bank corporation in favor of Rudolph Ganz, as successor trustee of the Oliver Ditson Endowment, a public charitable trust.'' In support of this contention it is argued that the evidence undisputably shows ''(a) that trust funds to the extent of $35,000 were misapplied by The First National Bank of Chicago and Carl D. Kinsey acting jointly for uses and purposes obviously not proper'' under the terms of the Ditson will and the statutes of Illinois, and ''(b) because The First National Bank of Chicago was placed upon inquiry as to the misappropriation of said sum of $35,000 from said trust fund by the following facts: (1) The form of the check for $100,000 and the widespread announcement generally in Chicago and elsewhere of the bequest under the Ditson will and the creation of the Oliver Ditson Endowment: (2) the endorsements on the $100,000 check; (3) the mingling of the proceeds of said check constituting trust funds with the personal funds in the personal account of Carl D. Kinsey; (4) the switching of trust funds from the account of Carl D. Kinsey to the account of Chicago Musical College; (5) the subsequent withdrawal of $80,000 of trust funds from the Chicago Musical College account in the form of a certificate of deposit.'' We think none of these contentions can be sustained. The check sent by the executors of the Ditson estate,

which we have above described, was payable to the Chicago Musical College. It was endorsed by the Chicago Musical College by Kinsey, its president, to the order of Carl Kinsey and deposited by him. These endorsements, on their face, were entirely proper and the deposit was received by the bank as that of Kinsey (in the absence of any notice to the bank that they were trust funds,) and there is no evidence that any announcement, made by the college of the bequest, was brought to the attention of the bank. Nor, so far as we are advised, was there any evidence in the record that the bank was advised or had any knowledge that the money was a trust fund until after it applied the $35,000 in payment of the note executed by the old college and for which the old college received that sum from the bank. There is no suggestion that this was not a *bona fide* loan made by the bank. In these circumstances we think the bank is in no way liable. *Massachusetts Bonding & Insurance Co. v. Standard Trust & Savings Bank,* 334 Ill. 494; *Mann v. Hahn,* 292 Ill. App. 220.

In the *Massachusetts Bonding Company* case, in stating the rule of law on which a bank is held liable where trust funds or the like are being wrongfully applied, the Supreme Court said (p. 502): ''The settled rule is, that if a depositor seeks to pay his own debt to the bank by an appropriation of the funds to his credit in a fiduciary capacity, the bank is affected with knowledge of the unlawful character of the appropriation and will be compelled to refund. . . . The reason for the rule is that the bank has knowledge that the check is in payment of the trustee's private debt. The bank officials may be said to have knowledge of the character of a transaction when a reasonably intelligent person would have such knowledge.'' Continuing the court said (pp. 503–4): ''The depository has a right to presume that the trustee will make legal use of the funds, (*State Nat. Bank v. Reilly,* [124 Ill. 464])

but where the transaction itself indicates that the use is a personal one the depository should no longer indulge such presumption as to that transaction,'' and that (p. 506) ''A bank may properly make payments on checks properly drawn unless the bank has some notice of an adverse claim or that the same are improperly drawn or in payment of the receiver's personal indebtedness, otherwise there would be no safety for a bank receiving deposits of trust funds to be paid out on a checking account. The enforcement of the rule insisted upon by defendant in error would make it practically impossible for fiduciaries to find a bank which would handle trust business of such character. . . . There is no evidence in the record to charge plaintiff in error with notice that any of the checks last listed [the 4th group] were drawn in payment of Joyner's personal obligations or for his own use. The law does not require a bank, under such facts, to assume the hazard of correctly reading in each check the purpose of the drawer, or, being ignorant of the purpose, to dishonor the check. . . . It is not claimed that plaintiff in error had any interest in or derived any benefit from said checks.'' And it was held that the bank was not liable for the checks mentioned in the group.

In the instant case the bank derived benefit of $35,000, but, as stated, there is no evidence that would put the bank on notice that the funds were trust funds.

The decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*